IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STACY RYAN, | ) | CASE NO._____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| CONSTANCE "CONNIE" RYAN and | ) | |
| STRECK, INC., | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Stacy Ryan, for her causes of action against Defendants, Constance "Connie" Ryan and Streck, Inc., hereby states and alleges as follows:

**PARTIES; JURISDICTION; AND VENUE**

1.     Plaintiff Stacy Ryan ("Stacy") is a resident of Omaha, Douglas County, Nebraska.

2.     Defendant Constance Ryan ("Connie") is a resident of Omaha, Douglas County, Nebraska.

3.     Defendant Streck, Inc. ("Streck") is a closely held Nebraska corporation that has been owned primarily by the seven members of the Dr. Wayne Ryan ("Dr. Ryan") and Eileen Ryan family since 1982.

4.     Streck has a principal place of business located at 7002 South 109th Street, LaVista, Sarpy County, Nebraska 68128.

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

6.     Venue in this Court is proper as a substantial part of the events and omissions giving rise to Stacy's causes of action arose in the district of Nebraska.

## BACKGROUND

7.     Dr. Ryan is the founder of Streck, and at all material and relevant times, Dr. Ryan and Eileen Ryan were the majority shareholders of Streck.  On May 4, 2007, Connie purchased 154,000 voting shares of Streck, and as of June 21, 2007 Dr. Ryan, Eileen Ryan, and Connie were the controlling shareholders of Streck.

8.     Connie has been a shareholder of Streck since 1985, President of Streck since 1993, Director of Streck since 1999, CEO and Chairman of the Board of Streck since 2013, and is also Manager of the Ryan Family Limited Liability Company ("RFLLC").

9.     Stacy is the daughter of Dr. Ryan and Eileen Ryan.

10.     Stacy is a beneficiary of the Eileen Ryan Revocable Trust and a Director on the Ryan Foundation Board.

11.     Stacy and her four siblings, including Connie (collectively the "Ryan Siblings"), were gifted with equal shares of Streck stock from their parents in or around 1985.  As a result of such gift, Stacy and the other Ryan Siblings each received what would become, after applicable stock splits, 5,500 voting shares of Streck and 2,789,470 non-voting shares of Streck (collectively "Gift Stock").

12.     In 1989, each of the Ryan Siblings executed a Stock Redemption Agreement regarding their Gift Stock and any other Streck shares they subsequently acquired or held (the "First Redemption Agreement").  The First Redemption Agreement provided, in part, that the Ryan Siblings would be compensated at book value should any of them redeem their shares with Streck.

13.     In 2003, all the Ryan Siblings, including Connie, executed a second Redemption Agreement (the "Second Redemption Agreement"), which replaced the First Redemption

Agreement and also provided, in part, that the Ryan Siblings would receive book value for the Gift Stock and any after acquired stock that was sold back to Streck.

14. Unbeknownst to Stacy until March 2015, on June 20, 2006, Dr. Ryan sent a letter to Streck's corporate attorneys which stated, in part, that Dr. Ryan's goal was to work at Streck as long as he was able and to do that required giving Connie the authority to manage or sell Streck, which would provide the greatest benefit for the Ryan family.

15. Unbeknownst to Stacy until March 2015, on July 14, 2006, Streck's corporate attorneys prepared a memorandum regarding Streck's business plan that proposed, in part, revisions to Streck's corporate structure that would place the ultimate decision making authority on a sale of Streck with Dr. Ryan during his lifetime and in Connie thereafter, with Connie holding a significant equity stake in Streck as opposed to the then current board of directors. The memorandum also indicated that Connie and Dr. Ryan had extensively examined a number of sale options, then proposed a purchase of additional shares of Streck by Connie with no change in the economic or equitable interests of Streck's shareholders with an indication that Connie's role as a significant shareholder of Streck would assure the remaining shareholders that an ultimate sale decision would be in the best interests of all Streck shareholders.

16. Unbeknownst to Stacy until March 2015, on July 17, 2006, Connie attended a meeting with Dr. Ryan to discuss his and Eileen Ryan's estates, where it was proposed that to minimize federal estate and Nebraska inheritance tax liability, Streck's corporate structure could be revised with a conversion of the Ryan Siblings' voting shares to non-voting shares, except for Connie's, the establishment of a voting trust between Connie and Dr. Ryan under which Connie would authorize Dr. Ryan to vote Connie's voting shares, and a proposed sale of stock between Connie and Dr. Ryan.

3

17.     Unbeknownst to Stacy until March of 2015, by letter dated November 2, 2006, Dr. Ryan informed Connie that he was in the process of updating his estate and business transition plan and that his goal was to maximize inheritance gifts to his family, reduce the estate taxes that would need to be paid, and allow Streck to continue as is.

18.     Unbeknownst to Stacy until 2015, on April 3, 2007, Dr. Ryan's estate planning lawyer e-mailed Connie a Business Succession Planning Outline that was to be presented at Streck's April 5, 2007 Special Meeting and Annual Meeting of Directors.  This e-mail was not copied to Dr. Ryan.

19.     The Business Succession Planning Outline attached to the April 3, 2007 e-mail proposed, in part, the following:

(a)     Transferring voting control of Streck to Connie as the successor to Dr. Ryan, without materially altering the Ryan family's participation in Streck's ownership on a long-term basis;

(b)     Declaring a stock dividend to facilitate a transfer of voting control to Connie, without diverting significant rights to distributions or other ownership rights from other Ryan family members;

(c)     Having the Ryan Siblings retain their 5,500 voting shares of Streck;

(d)     Transferring 154,000 shares of Streck's voting stock from Dr. Ryan to Connie, and 157,000 shares of Streck's voting stock from Dr. Ryan to Eileen Ryan;

(e)     Having Connie's Streck voting shares held in trust and not subject to a redemption agreement in the event Connie predeceased Dr. Ryan; and

(f)     Planning for Connie's successor and exploring other exit strategies and alternatives.

4

20.    Unbeknownst to Stacy, at Streck's April 5, 2007 Special Meeting and Annual Meeting of Directors, Dr. Ryan rejected the proposed conversion of the Ryan Siblings' voting shares to non-voting shares, and Streck's board of directors rescinded the plan to reduce the number of shares with voting rights because a different business succession plan was under consideration.

21.    Unbeknownst to Stacy until 2015, at the April 5, 2007 Special Meeting and Annual Meeting of Directors, Streck's Board of Directors did vote on one portion of the proposed Business Succession Plan Outline and authorized Dr. Ryan to terminate Connie's Redemption Agreement because Streck's "current redemption agreement with Connie Ryan is not consistent with the contemplated business succession plan."

22.    Unbeknownst to Stacy until 2015, Connie and Streck executed a Stock Redemption Revocation Agreement on April 19, 2007.

23.    Unbeknownst to Stacy, on May 4, 2007, Connie purchased 154,000 voting shares of Streck in exchange for a promissory note, but did not submit to or obtain the approval of her intended purchase of such shares by Streck's Board of Directors in violation of Streck's Articles of Incorporation.

24.    In addition, the voting trust between Connie and Dr. Ryan that was outlined in the Business Succession Planning Outline was never created even though Connie knew its purpose, had access to and spoke frequently with Streck's corporate lawyers and Dr. Ryan's and Eileen Ryan's estate planning lawyers, and was substantively involved in the business succession plan for Streck and Dr. Ryan's and Eileen Ryan's estates.

25.    By letter dated December 18, 2007, Connie sent Stacy a proposed revised Redemption Agreement and indicated that the most significant change was that the purchase

5

price had been changed from book value to fair market value as determined on an annual basis by Juris Valuation Advisors, LLC.

26.     Prior to executing the proposed revised Redemption Agreement, Stacy requested certain Tag-Along/Drag-Along Rights and initially disagreed with the Repurchase at Option of the Corporation clause, but was led to believe that the intent of said repurchase clause was for the purpose of facilitating a sale when Dr. Ryan decided to sell Streck to a third party.

27.     On November 10, 2008, Stacy executed the revised Redemption Agreement (the "Revised Redemption Agreement"), which replaced the Second Redemption Agreement and provided, in part, that the purchase price for redemption was "fair market value of the stock (subject to any applicable discounts or adjustments) as set forth in the most recent valuation prepared by Juris Valuation Advisors, LLC, or such successor appointed by the Corporation in its sole discretion, immediately preceding the date of the written notification of the option exercised by the Stockholder or the Corporation," and that Streck was entitled to redeem a shareholder's stock at anytime.  The Revised Redemption Agreement also included protection for minority shareholders through certain Tag-Along/Drag-Along Rights and provided that the Ryan Siblings would receive the same price as the controlling shareholders for shares transferred to one or more third parties when the transfer was of at least 51% of the outstanding stock of Streck.  A true and accurate copy of the Revised Redemption Agreement is attached hereto and marked as Exhibit "A".

28.     Unbeknownst to Stacy, and unlike the other Ryan Siblings, Connie never executed her own Revised Redemption Agreement.

29.     At all material and relevant times, Connie was engaged in a fraudulent scheme to secretly take control of Streck for her own pecuniary benefit to the detriment of Dr. Ryan, Eileen Ryan, and the other Ryan Siblings.

30.     On April 29, 2011, Connie met with Stacy and a psychologist in Omaha, Nebraska in an attempt to resolve certain family conflict.  During the meeting Connie stated that she was intentionally acting vengeful toward Stacy and wanted revenge on her siblings for perceived wrongs, then irrationally and erratically ended the meeting by storming from the room refusing to further participate.

31.     On February 24, 2012, Connie emailed Stacy and the other Ryan Siblings stating that she was scheduling meetings with a Chicago family business consultant to "resolve family conflict."

32.     Unbeknownst to Stacy until 2015, a memorandum from a meeting that Connie attended on March 7, 2012 to discuss her parents' estate issues and Streck ownership reflects that a large donation of funds was considered to the Omaha Community Foundation, of which Connie was the Vice Chair of the Board of Directors.  The memorandum also reflects that the repurchase of the Ryan Siblings' minority shares of Streck was discussed, along with the sale of Streck stock to a third-party who had expressed an interest in purchasing Streck.

33.     On March 28, 2012, Streck, through Dr. Ryan, emailed the Ryan Siblings, including Connie, and two Streck directors stating that it was his plan to buy all outstanding Streck stock, that he had looked for an outside buyer, and that he believed such transactions could occur in the near future.  Dr. Ryan also stated that his goal was to maintain Streck in its current existence with new management but that he intended to remain CEO, and that at its last valuation Streck's non-voting stock was worth $3.32 per share and its voting stock was worth

7

$3.49 per share, which would amount to approximately $9.3 million for each of the Ryan Siblings.

34.     On April 12, 2012, Dr. Ryan sent another email to the Ryan Siblings, including Connie, stating that some of the siblings had expressed a desire to keep their shares, then asked the Ryan Siblings to let him know if they wanted to keep their shares and provided a valuation of the Ryan Siblings' stock at approximately $9.5 million each.

35.     That same date, Stacy replied to Dr. Ryan and to all the other Ryan Siblings that she was concerned about Connie's involvement in Streck, Connie's inside information, and Stacy's inability to make an educated decision on whether to sell her shares without more information.  Stacy then requested basic information on Streck's future plans, but received no replies to this email from any Streck officer or director, including Connie.

36.     Unbeknownst to Stacy until 2015, on April 13, 2012, Connie attended another meeting with her parents' estate lawyer and Dr. Ryan, but without Eileen Ryan.  At the meeting, a partial sale of Streck to an outside buyer was discussed, along with the need for a clear succession plan, the redemption of the Ryan Siblings' stock with an earn out provision to guarantee the Ryan Siblings were treated as current shareholders and could receive any upside in the value of their shares should Streck sell to a third-party at a higher value, and that Streck needed new management that would make a difference.

37.     Unbeknownst to Stacy until 2015, on April 26, 2012, Dr. Ryan's estate planning counsel emailed Connie advising that it was a good time for Dr. Ryan and Eileen Ryan to refocus on their current estate plan and confirm their intentions, and included, for Dr. Ryan's and Eileen Ryan's review, a memorandum that contained a high level summary of the distribution of their estates.

8

38.     On April 29, 2012 Stacy met with the Chicago family business consultant who explained to Stacy that his purpose was to determine if the Ryan Siblings could come to an agreement on making Connie CEO of Streck, but that if such an agreement could not be reached, then Dr. Ryan would sell Streck.

39.     During the April 29th meeting, Stacy stated that she was opposed to making Connie CEO of Streck because Connie was not qualified for the position and that long time board members of Streck had expressed the same opinion. Stacy then asked if there was another meeting planned to which the consultant stated that he did not know. Another meeting was scheduled for the next day, but Stacy was not informed or included.

40.     After inquiring into what was discussed at the April 30th meeting, Stacy was intentionally excluded from future Ryan "family meetings" by Connie and was told by Connie that all future family discussions with the consultant were "confidential", despite Dr. Ryan's direction that Stacy ask Connie or the consultant for minutes from the meetings.

41.     After the April 30th meeting, Connie then scheduled another "family meeting," but e-mailed Stacy the wrong proposed dates and then confirmed the meeting for June 14, 2012, which was a date that was never proposed to Stacy.

42.     Stacy informed Connie that Stacy had scheduled tests for an upcoming back surgery, but Connie refused to accommodate Stacy even though Connie had accommodated another shareholder so that the shareholder could go to the dentist.

43.     On June 18, 2012, Stacy e-mailed Connie asking for information from the June 14th meeting with the family business consultant from which Stacy received no reply.

44.     That same date, Dr. Ryan told Stacy to call the family business consultant and ask him for a summary of the June 14th meeting, but the consultant refused to give Stacy any information.

45.     Thereafter, the Chicago family business consultant instructed members of the Ryan family not to talk with Stacy, which they honored until after Stacy redeemed her shares with Streck.

46.     Unbeknownst to Stacy until March 2015, on June 11, 2012, Connie had attended another meeting with Dr. Ryan and his estate lawyer.  The notes from the June 11th meeting reflect that:

(a)     Streck was holding a substantial amount of cash and equities prior to the redemption of the Ryan Siblings' shares, but that Connie would retain her shares;

(b)     The redemption of the Ryan Siblings' shares, except Connie's, would be completed by the end of Streck's fiscal year;

(c)     After redeeming the Ryan Siblings' shares, except Connie's, Streck would make a $10 million distribution to Dr. Ryan, Eileen Ryan, and Connie who would be the only remaining shareholders; and

(d)     That trusts would be set up for each Ryan Sibling, and that Connie's trust would be funded with non-voting shares of Streck.

47.     By letter dated June 19, 2012, Dr. Ryan informed Stacy that Streck had elected to redeem her shares, that she was required to sign the enclosed Stock Purchase Agreement and Stock Power to complete the transaction, that upon receipt of the executed Stock Purchase Agreement and Stock Power Stacy would be sent a check for $9,280,235, and requested that Stacy complete the Stock Purchase Agreement and Stock Power by July 2, 2012.

48.     Stacy initially refused to sign the proposed Stock Purchase Agreement, and subsequently learned that Streck had wired the amount of the proposed redemption payment into Stacy's bank account without her consent on June 27, 2012. Stacy had the funds sent back to Streck that same day.

49.     Following Stacy's return of the proposed redemption payment, Streck, by and through Dr. Ryan, sent Stacy another letter dated June 27, 2012, stating that Streck had purchased her shares and that Streck had sent her a wire transaction for the funds, which she had rejected.  The June 27th letter then stated that the proposed redemption funds were available for Stacy at her discretion, but that if Stacy did not claim said funds Streck would follow Nebraska's guidelines for unclaimed property.  The letter concluded by stating that Stacy was no longer a shareholder of Streck effective June 27, 2012.

50.     On June 28, 2012, Stacy sent Connie and Dr. Ryan a request for Streck's corporate records pursuant to Neb. Rev. Stat. § 21-20,183, in which Stacy requested, among other things, all valuations of Streck along with the names and the number of voting and non-voting shares held by all Streck shareholders as of April 1, 2012.

51.     By letter dated July 3, 2012, Streck, by and through counsel, rejected Stacy's corporate records request and stated that as of June 19, 2012 Stacy was no longer a shareholder of Streck and was therefore no longer entitled to Streck's corporate records.

52.     Unbeknownst to Stacy, on July 13, 2012, Dr. Ryan sent a memorandum to the Ryan Siblings, excluding Stacy and Connie, offering to purchase their Streck voting stock for $3.40 per share and their non-voting stock for $3.32 per share, but that such prices could not be offered after July 27th if they elected to keep their stock.

11

53.     Unbeknownst to Stacy, on July 13, 2012, Dr. Ryan sent another memorandum to the Ryan Siblings, excluding Stacy but including Connie, offering to purchase their Streck voting stock for $3.49 per share and their non-voting stock for $3.32 per share, but that they had to let Streck know if they wanted to sell their stock by July 23, 2012.

54.     On July 20, 2012, Dr. Ryan sent another memorandum to the Ryan Siblings, excluding Stacy but including Connie, stating that he truly wanted them to sell their shares back to Streck because it was intended to be their inheritance and not for any of them to be part of the company.

55.     As Stacy was considering the redemption of her shares in Streck, Stacy also inquired about selling her interest in the RFLLC.

56.     On July 24, 2012, Connie, RFLLC's Manager, instructed Stacy to please "not contact Streck directly.  If you have requests please communicate these through your lawyer with regards to Streck, Inc. and the RFLLC."   Stacy's e-mails were then blocked from all Streck recipients.

57.     Thereafter, Stacy received ongoing pressure from Streck's corporate attorneys to execute the proposed Stock Purchase Agreement by volunteering information that the other Ryan Siblings were selling their shares back to Streck and conditioning the release of RFLLC records on Stacy's agreement to sign the proposed Stock Purchase Agreement on Streck's terms.

58.     On August 16, 2012, Streck, by and through counsel, represented to Stacy that the other Ryan Siblings who had executed the Stock Purchase Agreement as part of the redemption of their shares would be receiving the same purchase price for their redeemed shares as had been offered to Stacy.

59.     Based on this representation that all the other Ryan Siblings had executed the Stock Purchase Agreement and were selling all of their shares back to Streck for the same price, Stacy executed the Stock Purchase Agreement on August 22, 2012 after crossing out the mutual release.

60.     On August 29, 2012, Streck, by and through counsel, informed Stacy that the Stock Purchase Agreement was accepted in the form Stacy submitted with the mutual release deleted.   Attached hereto and marked as Exhibit "B" is a true and correct copy of the Stock Purchase Agreement.

61.     The Stock Purchase Agreement provided that Streck had elected to purchase Stacy's shares pursuant to the Revised Redemption Agreement and that the purchase price for Stacy's voting and non-voting shares of Streck was $9,280,235, which was represented to be equal to or greater than the purchase price that would be due under the Revised Redemption Agreement.   The Stock Purchase Agreement also represented that neither Streck nor its shareholders had been engaged in any negotiations to transfer at least 51% of Streck's outstanding stock in any merger, sale, exchange, or similar transaction.

62.     Unbeknownst to Stacy and despite the representations Stacy received that all the other Ryan Siblings were selling their stock back to Streck on substantially the same terms as Stacy, Connie did not redeem any of her shares with Streck and instead retained all of her Gift Stock and the 154,000 voting shares she had secretly purchased in 2007.

63.     In furtherance of her fraudulent scheme to take control of Streck for her own pecuniary benefit, Connie was deeply involved in the business planning of Streck, the estate planning of Dr. Ryan's and Eileen Ryan's estates, and was privy to information that none of the other Ryan Siblings could access, as evidenced by Connie attending estate planning meetings on

13

July 17, 2006, April 3, 2007, April 5, 2007, March 7, 2012, April 13, 2012 and June 11, 2012, and receiving correspondence from her parents' estate attorneys on April 26, 2012 and February 26, 2013.

64.     Upon information and belief, Connie undertook efforts to keep secret and prevent the other Ryan Siblings from learning her inside information about the succession planning for Streck, her purchase of Streck's voting shares, the estate planning of Dr. Ryan and Eileen Ryan, Streck's financial condition, Streck's future plans, and her intent to retain her shares in Streck despite assurances to the contrary given by Streck's corporate attorneys.

65.     Further, in September of 2012 Eileen Ryan met Stacy for lunch and informed her that shortly after the lunch had been scheduled, Connie called Eileen and falsely indicated that Stacy's husband had demanded all of Dr. Ryan's and Eileen Ryan's financial information and requested that Eileen cancel her lunch with Stacy.

66.     Upon information and belief, during the meetings with the family business consultant, Connie also claimed that she had been solely running Streck for the past ten years and that Dr. Ryan was demented, insisted that she be made CEO of Streck, and then became angry and sobbed when the family would not vote to make her CEO.

67.     Connie also manipulated her parents by often lying to them, interfering in Eileen and Stacy's social plans, and blocking Stacy's access to her mother when she became terminally ill.

68.     Immediately after Eileen Ryan's funeral, Connie became antagonistic toward Dr. Ryan and without permission took a substantial amount of jewelry from her parents' home including the wedding ring Eileen had left to Stacy.

14

69.     In addition, after Eileen's death Connie never called or communicated with Dr. Ryan unless it was related to Connie becoming CEO of Streck.

70.     On or about March 22, 2013, Dr. Ryan asked Stacy to come to his office at Streck to review some documents, but certain Streck employees initially refused to allow Stacy to enter the building. After allowing Stacy to enter, Dr. Ryan's research assistant stood in Dr. Ryan's office while Stacy was there.

71.     Dr. Ryan later told Stacy that Connie had informed Dr. Ryan that Connie was now CEO, and Connie scheduled dinner with Dr. Ryan and Connie's boyfriend to question Dr. Ryan about Streck. Thereafter, Connie barely spoke to Dr. Ryan, but would invite him out to public events and conduct other manipulative measures to force Dr. Ryan out as CEO of Streck.

72.     Unbeknownst to Stacy until the death of Eileen Ryan in 2013, Connie was bequeathed 159,500 voting shares of Streck through Eileen Ryan's trust, which Connie was aware of prior to the redemption of Stacy's shares in August 2012. As a result, Connie obtained approximately 2/3 voting control of Streck when Eileen's bequest was combined with the 154,000 voting shares of Streck that Connie had secretly purchased in 2007.

73.     As a result of Stacy's and other Ryan Siblings' redemption, excluding Connie, Connie's ownership interest in Streck increased by at or around 2%, after which Streck declared and Connie received dividends in 2013 and 2014 in an amount based on her approximately 7.6% ownership interest in Streck.

74.     Had Stacy known that Connie secretly bought 154,000 shares of Streck voting stock, that Eileen Ryan's trust had been changed in 2007 to bequeath Connie all of Eileen Ryan's Streck voting stock, that Connie's redemption agreement had been revoked, and that Connie refused to redeem her shares in Streck, Stacy would not have entered into the Stock Purchase

Agreement to complete the redemption of her shares with Streck on the terms set forth on Exhibit "B".

75.     In addition and unbeknownst to Stacy until March 2015, the amount paid by Streck to redeem Stacy's shares on or about August 22, 2012, was not at fair market value as required by the terms of the Stock Purchase Agreement and Revised Redemption Agreement.

76.     Unbeknownst to Stacy until March 2015, despite knowledge of the fair market value of Stacy's shares by Connie and Streck, such information was not provided to Stacy at the time her shares were redeemed in 2012.  Upon information and belief, the information withheld included, but is not limited to, the items set forth above and in paragraph 80 below.

77.     Further, Connie and Streck failed to disclose the amount of revenue that Streck expected to receive in future years and its short term plans to make significant distributions to shareholders, despite knowledge of such information at the time of Stacy's redemption.

78.     In addition, Connie and Streck also failed to disclose at the time of Stacy's redemption that Streck was contemplating various financial transactions with outside investors who had engaged in preliminary evaluations of Streck, and that Streck was contemplating the payment of cash dividends to the remaining shareholders after Stacy's redemption.

79.     Upon information and belief, Streck and Connie intentionally refrained from performing its 2012 annual valuation in a direct attempt to undervalue Stacy's shares in Streck for Connie's and Streck's own pecuniary benefit given the proposed $10 million dividend distribution to the remaining shareholders of Streck following the Ryan Siblings' redemption, except for Connie, along with the proposed sales of Streck to third-party buyers.

## SPECIFIC WRONGFUL ACTIONS OF STRECK AND CONNIE

80.     Stacy incorporates paragraphs 1 through 79 of this Complaint as if fully set forth herein.

81.     For purposes of specificity, each of the following specific acts and omissions of Defendants (the "Wrongful Acts") relate to the causes of action set forth below:

(a) Prior to Stacy's redemption, Connie and Streck failed to disclose that on May 4, 2007, Connie had acquired 154,000 voting shares of Streck in violation of Streck's Article of Incorporation, that such shares were not subject to a redemption agreement, and that the Redemption Agreement as to Connie was revoked;

(b) Prior to Stacy's redemption, Streck and Connie failed to disclose that the May 4, 2007 sale of Streck stock to Connie was not submitted to or approved by Streck's Board of Directors, despite Connie's pecuniary interest in such transaction and in violation of Streck's Articles of Incorporation;

(c) Prior to Stacy's redemption, Streck and Connie failed to disclose that Connie did not redeem her Gift Shares or the 154,000 voting shares of Streck stock that she secretly acquired in 2007, or that Eileen Ryan's Trust was changed in 2007 to include a bequest of 159,500 voting shares of Streck to Connie;

(d) Prior to Stacy's redemption, Connie and Streck failed to disclose that Connie's interest in Streck would increase by at or around 2% when the Ryan Siblings' shares, excluding Connie's, were redeemed and that Connie would individually benefit as a result of such transaction;

(e) Prior to Stacy's redemption, Streck and Connie failed to disclose that as of July 2006, Streck had examined a number of sale options and the various valuations in connection

therewith, and that such sale options included, without limitation, the potential sale of a minority interest to a private equity firm, sale of Streck to a local investor, sale of Streck to "industry buyers", a possible sale of all or part of Streck to a venture capitalist, and that such proposed transactions reflected a valuation substantially higher than what was paid to Stacy to redeem her shares;

(f) Prior to Stacy's redemption, Streck and Connie failed to disclose that they were engaged in the process of selling Streck and that Connie had contacted a "purchaser of national recognition" who was interested in purchasing Streck who eventually provided Connie with a stock purchase proposal approximately 7 months after Stacy redeemed her shares and that such proposed transactions reflected a valuation substantially higher than what was paid to Stacy to redeem her shares;

(g) As evidenced by a professional appraisal completed on June 5, 2014 (the "Appraisal"), on March 28, 2012, Streck falsely represented that its voting and non-voting shares were worth $3.49 and $3.32, respectively, when in fact the fair market value of such shares was worth at or around $11.08 per share, reduced to at or around $8.33 per share for voting stock and $8.09 per share for non-voting stock with applicable discounts as of March 7, 2013, but with no change in Streck's business operations between the redemption of Stacy's shares and the "As of" date of the Appraisal;

(h) On April 12, 2012, Streck falsely represented that the total value of Stacy's Streck stock was worth approximately $9.5 million, which as evidenced by the Appraisal, was valued at a total of at or around $23 million as of March 7, 2013, with no material adverse change in Streck's business operations between the redemption of Stacy's shares and the "As of" date of the Appraisal;

(i) Prior to Stacy's redemption, Streck and Connie failed to disclose that as of April 13, 2012, Streck was considering a partial sale of Streck to an outside buyer;

(j) Prior to Stacy's redemption, Streck and Connie failed to disclose that as of June 11, 2012, Streck was holding a substantial amount of cash and equities, that Connie did not intend to redeem her shares, and that after Stacy's redemption Streck intended to immediately make a $10 million distribution to Dr. Ryan, Eileen Ryan, and Connie Ryan, who would be the only remaining shareholders of Streck;

(k) Prior to Stacy's redemption, Streck and Connie failed and refused to provide Stacy with any financial statements or corporate records including, without limitation, internal and audited financial statements referenced in the Appraisal that were available prior to Stacy's redemption and falsely represented that Stacy was not entitled to such records;

(l) Despite still being a shareholder of Streck, on June 27, 2012, Streck falsely represented to Stacy that she was no longer a shareholder effective June 27, 2012, and failed to inform Stacy prior to Stacy's redemption that such statements were false;

(m) Despite still being a shareholder of Streck, on July 3, 2012, Streck and Connie, by and through counsel, falsely represented that Stacy was no longer a shareholder of Streck as of June 19, 2012 and improperly denied Stacy's June 28, 2012 corporate records request for, among other things and without limitation, all valuations of Streck along with the names and the number of voting and non-voting shares held by all of Streck's shareholders as of April 1, 2012, and failed to inform Stacy prior to Stacy's redemption that such statements were false;

(n) Despite Connie's refusal to execute her own Stock Purchase Agreement and her intent to retain her shares in Streck, on August 16, 2012, Streck and Connie, though counsel,

falsely represented to Stacy that the other Ryan Siblings had executed a Stock Purchase Agreement, that the Ryan Siblings would all receive the same purchase price as was offered to Stacy as part of the redemption of their shares, that all shareholders should be treated similarly in executing the Stock Purchase Agreement, and that a court would look favorably on Streck's position;

(o) Prior to Stacy's redemption, Streck and Connie falsely represented in the Stock Purchase Agreement that the purchase price of Stacy's shares was equal to or greater than the fair market value of such shares under the terms of the Revised Redemption Agreement and that neither Streck nor its shareholders had been engaged in any negotiations to transfer at least 51% of Streck's outstanding stock in any merger, sale, exchange, or similar transaction, when Connie and Streck were considering and had considered the sale of Streck to an outside buyer and that the fair market value of Stacy's shares, as evidenced by the Appraisal and offers from potential third-party buyers, was substantially higher than the purchase price paid by Streck to Stacy;

(p) In or around August 2012, Streck stated that the RFLLC corporate records would not be provided to Stacy until she executed the Stock Purchase Agreement, without the mutual release crossed out, as well as an unreasonable confidentiality and disclosure agreement for the RFLLC; and

(q) Prior to Stacy's redemption, Streck and Connie failed to disclose information related to Streck's legal proceedings with R&D Systems, the fact that Streck had prevailed against R&D Systems in those proceedings, and the effect that the outcome of those proceedings had on the value of Stacy's shares.

(r) Upon information and belief, Streck and Connie intentionally refrained from performing its 2012 annual valuation in a direct attempt to undervalue Stacy's shares in Streck for Connie's and Streck's own pecuniary benefit given the proposed $10 million dividend distribution to the remaining shareholders of Streck following the Ryan Siblings' redemption, except for Connie, along with the proposed sales of Streck to third-party buyers.

## COUNT I—FRAUDULENT MISREPRESENTATION AND INDUCEMENT

82.     Stacy incorporates paragraphs 1 through 81 of this Complaint as if fully set forth herein.

83.     As more particularly set forth above as Wrongful Acts, Connie and Streck made the following false representations and intentional concealments to Stacy:

(a)     On March 28, 2012 and April 12, 2012, Streck falsely represented that Stacy's voting and non-voting shares in Streck were worth $3.49 and $3.32 per share, respectively, for a total of approximately $9.3 to 9.5 million, which was substantially less than the fair market value of such shares, as evidenced by the Appraisal;

(b)     On June 27, 2012, Streck falsely represented to Stacy that she was no longer a shareholder in Streck effective July 27, 2012, despite Stacy's initial refusal to execute the Stock Purchase Agreement and her return of the funds that were wired into her bank account by Streck without her consent, and then failed to inform Stacy prior to her redemption that such statements were false;

(c)     On July 3, 2012, Streck and Connie improperly denied Stacy's corporate records request and falsely represented to Stacy that she was not entitled to Streck's

21

corporate records because she was no longer a shareholder as of June 19, 2012, despite Stacy's refusal to execute the Stock Purchase Agreement to complete the redemption of her shares in Streck, and then failed to inform Stacy prior to her redemption that such statements were false;

(d)     On August 16, 2012, Streck and Connie falsely represented to Stacy that the other Ryan Siblings had executed a Stock Purchase Agreement and were redeeming their shares in Streck on substantially the same terms as Stacy, despite Connie's refusal to execute a Stock Purchase Agreement and her intent not to redeem any of her shares in Streck, and then failed to inform Stacy prior to her redemption that such statements were false;

(e)     As evidenced by the Appraisal, in the terms of the Stock Purchase Agreement executed August 22, 2012, Streck and Connie falsely represented to Stacy that the purchase price of her shares was equal to or greater than the fair market value of such shares under the terms of the Revised Redemption Agreement;

(f)     In the terms of the Stock Purchase Agreement dated August 22, 2012,, Streck and Connie also falsely represented to Stacy that neither Streck nor its shareholders had been in engaged in any negotiations to transfer at least 51% of Streck's outstanding stock in any merger, sale, exchange, or similar transaction, despite the fact that Connie and Streck knew of and were considering a sale of Streck to outside buyers; and

(g)     Connie fraudulently concealed her May 4, 2007 purchase of 154,000 shares of Streck voting stock from Dr. Ryan, that Eileen Ryan's trust had been changed in 2007 to bequeath Connie all of Eileen Ryan's Streck voting stock which she knew

prior to Stacy's redemption, that Connie's revocation agreement for her Streck stock had been revoked, that she intended to retain her shares in Streck, and all the material information related to the value of Stacy's shares at the time of their redemption;

84.     Streck and Connie made the above false representations and intentional concealments in an effort to induce Stacy to execute the Stock Purchase Agreement and complete the redemption of her shares in Streck with the intent that Stacy would rely on such representations and concealments in redeeming her shares in Streck for substantially less than fair market value under the terms of the Revised Redemption Agreement.

85.     Stacy reasonably relied on such false representations and intentional concealments in executing the Stock Purchase Agreement to complete the redemption of her shares in Streck on or about August 22, 2012.

86.     As a direct and proximate result of Stacy's reasonable reliance on Streck's and Connie's false representations and intentional concealments, Stacy executed the Stock Purchase Agreement to complete the redemption of her shares in Streck for substantially less than fair market value under the terms of the Revised Redemption Agreement, and has been damaged in an amount to be proven at trial.

### COUNTS II & III—VIOLATIONS OF THE SECURITIES ACT OF NEBRASKA AND THE SECURITIES EXCHANGE ACT OF 1934

87.     Stacy incorporates paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88.     As more particularly described above, Connie and Streck's Wrongful Acts in connection with the redemption of Stacy's shares in Streck constitute the unlawful purchase of a security in violation of section 8-1102 of the Securities Act of Nebraska, Neb. Rev. Stat. § 8-

1102, and section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§ 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, because Connie and Streck employed a scheme

to defraud, Stacy's shares were purchased by means of untrue statements and intentional

omissions of material fact, and Connie's and Streck's Wrongful Acts operated as a fraud and

deceit upon Stacy.

89.     At the time Stacy redeemed her shares in Streck in 2012, Connie and Streck knew

or should have known that the misrepresentations and intentional omissions of material fact more

particularly described above as Wrongful Acts were misleading.

90.     By engaging in the Wrongful Acts more particularly described above, Connie and

Streck intended to deceive and to induce Stacy to rely on such misrepresentations and omissions

of material fact in executing the Stock Purchase Agreement necessary to complete the

redemption of her shares in Streck and to minimize the amount that Stacy would receive in

redeeming said shares for Connie's and Streck's own pecuniary benefit, as evidenced by the $10

million distribution to the remaining shareholders of Streck following the Ryan Siblings'

redemption, excluding Connie, and the proposals considered in connections with the sale of

Streck to potential third-party buyers.

91.     Stacy justifiably relied on Streck's and Connie's misrepresentations and

omissions of material fact more particularly described above as Wrongful Acts in redeeming her

shares with Streck

92.     The earliest that Stacy could have become aware of the misrepresentations and

omissions of material fact more particularly described above as Wrongful Acts was in or around

October 2014.

93.     As a direct and proximate result of Defendant's violations of section 8-1102 of the Securities Act of Nebraska, section 10(b) of the Exchange Act, and Rule 10b-5, Stacy has been damaged, in an amount to be proven at trial, by being induced to execute the Stock Purchase Agreement to complete the redemption of her shares in Streck for substantially less than fair market value under the terms of the Revised Redemption Agreement.

94.     Additionally, and as more particularly set forth above, at all material and relevant times Connie was engaged in a fraudulent scheme to secretly take control of Streck, which ultimately lead to her becoming CEO and Chairman of the Board in 2013;with respect to the redemption of Stacy's shares in Streck in 2012, through her Wrongful Acts Connie was in control of Streck, either directly or indirectly, in fraudulently inducing Stacy to executed the Stock Purchase Agreement to complete the redemption of her shares in Streck for substantially less than fair market value under the terms of the Revised Redemption Agreement.

95.     As a result, Connie is jointly and severally liable to Stacy as a control person under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

### COUNT IV—BREACH OF FIDUCIARY DUTY

96.     Stacy incorporates paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97.     As an officer, director, and shareholder of Streck, a closely held corporation, Connie owed certain fiduciary duties to Streck and its shareholders, including Stacy.

98.     By engaging in the Wrongful Acts more particularly set forth above, Connie breached her fiduciary duties to Stacy by failing to provide Stacy with all material information concerning the fair market value of her shares in Streck under the terms of the Revised Redemption Agreement and the direct pecuniary benefit that Connie stood to receive as a result

of the Ryan Siblings' redemption, and by making false representations related to the fair market value and the redemption of Stacy's shares, Stacy's status as a shareholder of Streck, and the redemption of the other Ryan Siblings' shares.

99.     As a direct and proximate result of Connie's breach of her fiduciary duties, Stacy has been damaged, in an amount to be proven at trial, by being induced to execute the Stock Purchase Agreement to complete the redemption of her Streck stock for substantially less than fair market value under the terms of the Revised Redemption Agreement.

<b>COUNT V—SHAREHOLDER OPPRESSION</b>

100.    Stacy incorporates paragraphs 1 through 99 of this Complaint as if fully set forth herein.

101.    Prior to her redeeming her shares on or about August 22, 2012, Stacy was a minority shareholder in Streck at all material and relevant times.

102.    As set forth above, at the time of Stacy's redemption Connie was in control of Streck as a result of her Wrongful Acts, which included, without limitations, Connie's secret purchase of 154,000 shares of Streck voting stock in 2007.

103.    The Wrongful Acts more particularly set forth above constitute unlawful acts of oppression by Connie and Streck directed at Stacy to force her out as a shareholder of Streck.

104.    As a direct and proximate result of Connie's and Streck's unlawful oppression, Stacy has been damaged, in an amount to be proven at trial, by being induced to execute the Stock Purchase Agreement to complete the redemption of her shares in Streck for substantially less than fair market value under the terms of the Revised Redemption Agreement.

## COUNT VI—CONVERSION

105.    Stacy incorporates paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.    As a direct and proximate result of Streck's and Connie's Wrongful Acts set forth above, Stacy executed the Stock Purchase Agreement to complete the redemption of her shares in Streck for substantially less than fair market value under the terms of the Revised Redemption Agreement.

107.    As a result, Streck and Connie are in wrongful possession and control of money and/or assets that belong to Stacy, namely the stock that Stacy redeemed with Streck under the Stock Purchase Agreement and all dividends or other distributions associated therewith, or the difference between the purchase price Stacy received and the fair market value of Stacy's stock at the time of its redemption under the terms of the Revised Redemption Agreement.

108.    Streck and Connie remain in possession and continue to exert wrongful dominion and control over such assets, thereby depriving Stacy of her right to immediate possession and control of said property.

109.    As a direct and proximate result of Streck's and Connie's unlawful conversion of said assets, Stacy has been damaged in an amount to be proven at trial.

## COUNT VII—TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

110.    Stacy incorporates paragraphs 1 through 109 of this Complaint as if fully set forth herein.

111.    Prior to Stacy's redemption, Stacy had a valid business expectancy in her ownership rights as a shareholder of Streck which included, without limitations, voting rights,

the right to distributions, stock appreciation, and the proceeds of a potential sale of Streck to a third-party.

112.    Both Streck and Connie, as an officer, director, and shareholder of Streck, had knowledge of Stacy's business expectancy in her ownership rights as a shareholder of Streck.

113.    By engaging in the Wrongful Acts more particularly set forth above and the unlawful acts set forth in Counts I through VI, Connie and Streck have unjustifiably and intentionally interfered with Stacy's business expectancy in her ownership rights as a shareholder of Streck.

114.    As a direct and proximate result of Streck's and Connie's unjustifiable and intentional interference with Stacy's business expectancy in her ownership rights as a shareholder of Streck, Stacy has been damaged in an amount to be proven at trial, which includes, without limitation, Stacy's expectancy in the $10 million distribution that was provided to all remaining Streck shareholders after the redemption of Stacy's shares.

## COUNT VIII—UNJUST ENRICHMENT

115.    Stacy incorporates paragraphs 1 through 114 of this Complaint as if fully set forth herein.

116.    If it is found that Connie and Streck engaged in the unlawful acts more particularly set forth above in Counts I through VII, Connie and Streck have been unjustly enriched in retaining the difference between the fair market value of Stacy's Streck shares under the terms of the Revised Redemption Agreement and the purchase price paid for Stacy's shares at the time of their redemption.

28

117.    Connie has also been unjustly enriched in receiving and retaining the benefit of any dividend that was distributed to all remaining shareholders after Stacy and the other Ryan Siblings, except Connie, redeemed their shares.

118.    It would be inequitable and unconscionable to permit Streck and Connie to receive and retain the above benefits without compensating Stacy.

## COUNT IX—BREACH OF CONTRACT

119.    Stacy incorporates paragraphs 1 through 118 of this Complaint as if fully set forth herein.

120.    Alternatively, if it is found that Connie and Streck did not engage in the Wrongful Act more particularly set forth above and in Counts I through VIII, then on August 22, 2012, Streck agreed to redeem Stacy's shares in Streck at fair market value pursuant to the terms of the Revised Redemption Agreement entered into on November 10, 2008.

121.    At all material and relevant times Stacy performed in accordance with all terms and conditions of the Stock Purchase Agreement and Revised Redemption Agreement.

122.    As set forth above, Streck failed to redeem Stacy's Streck shares at fair market value under the terms of the Stock Purchase Agreement and Revised Redemption Agreement.

123.    Streck's failure to redeem Stacy's shares at fair market value pursuant to the terms of the Stock Purchase Agreement and Revised Redemption Agreement constitutes a material breach of said agreements.

124.    As a direct and proximate result of Streck's material breach of the Stock Purchase Agreement and Revised Redemption Agreement, Stacy has been damaged in an amount to be proven at trial, which includes, without limitation, the difference between the amount Stacy was

paid to redeem her shares in Streck and the fair market value of such shares at the time of their redemption under the terms of the Revised Redemption Agreement.

WHEREFORE, Plaintiff, Stacy Ryan, prays that this Court enter judgment in her favor and against Defendants, Constance "Connie" Ryan and Streck, Inc., jointly and severally, on Plaintiff's causes of action and order the following:

- That Connie's 2007 purchase of 154,000 shares of Streck voting stock be invalidated and set aside;

- That the Stock Purchase Agreement that Stacy entered into with Streck be rescinded and that Streck's redemption of Stacy's shares be set aside, Plaintiff reserves her right to tender to Defendants the purchase price paid by Streck to redeem Plaintiff's shares, or, in the alternative, that Defendants pay damages to Plaintiff equal to the difference between the purchase price Streck paid Stacy under the Stock Purchase Agreement and the fair market value of Stacy's shares at the time of their redemption under the terms of the Revised Redemption Agreement;

- That Defendants pay any and all additional damages to which Plaintiff is entitled under Plaintiff's causes of action; plus

- Any and all such further relief, including costs and reasonable attorney's fees, to which Plaintiff is entitled.

## DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, Stacy Ryan, and hereby demands trial by jury of all issues so triable.

Dated this  21st  day of August, 2015.

STACY RYAN, Plaintiff,

By:    /s/Paul D. Heimann
         Paul D. Heimann, #21727
         Nicholas F. Sullivan, #25351
         ERICKSON | SEDERSTROM, P.C.
         10330 Regency Parkway Drive
         Omaha, NE 68114
         (402) 397-2200
         (402) 390-7137 Fax
         pheim@eslaw.com
         nsull@eslaw.com
         Attorneys for Plaintiff

2008

# REDEMPTION AGREEMENT

**THIS REDEMPTION AGREEMENT** ("Agreement") is made by and between STRECK, INC., a Nebraska corporation ("Corporation"), and Stacy Ryan ("Stockholder").

**WHEREAS:**

**A.**    Stockholder is the owner of certain issued and outstanding shares of capital stock of the Corporation, the number of shares owned appearing opposite Stockholder's name at the foot of this Agreement; and

**B.**    The parties believe that it is in their best interests to make provisions for the future disposition of the shares of capital stock of the Corporation, and to provide that such shares shall be transferable only upon compliance with the terms of this Agreement, and to bind themselves to this Agreement in consideration for the mutual promises contained herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Stock Subject to Agreement.**  This Agreement shall apply and relate to all capital stock of the Corporation now issued or hereafter issued to Stockholder (whether acquired through purchase, gift, bequest, etc.) and shall hereinafter be collectively referred to as the "stock".

2.    **Restriction on Transfer.**  No sale, assignment, transfer, pledge, hypothecation or other disposition of the stock, owned or held by Stockholder, or any interest therein, hereinafter referred to as a "transfer of stock", shall be valid unless made in accordance with the terms and provisions of this Agreement.  Notwithstanding anything in this Agreement to the contrary, Stockholder may, during Stockholder's lifetime or upon death, transfer ownership of all or any part of his/her stock to his spouse, one or more of his children, or a trustee of a trust which is qualified under the Internal Revenue Code to hold Subchapter S stock (each, a "Transferee"). The parties further agree that each Transferee must sell all stock owned by such Transferee to the Corporation upon the death of such Transferee in accordance with Section 6.  In the event that a Stockholder shall intend to effect a transfer of stock to a bona fide purchaser in an arms-length transaction which would otherwise be prohibited by the provisions of this Agreement, such Stockholder (herein called the "Offering Stockholder"), shall first deliver written notice of such intention (herein called the "Sale Notice") to the Corporation.  The Sale Notice shall delineate the price and terms of such intended transfer (herein called the "Sale Terms") and shall include complete copies of all documents which would effect and close such intended transfer and the name of the intended transferee.  In the event that the Sale Terms include non-cash consideration, such non-cash consideration shall be ignored and the cash sale price element of the Sale Terms shall be augmented to include that amount which is the fair cash value of such non-cash consideration to an arms-length purchaser on an open market and the Sale Notice shall include a statement by the Offering Stockholder's regular, certified public accountants as to the amount of such fair cash value.  Upon the date of delivery of a Sale Notice (herein called the

1



**EXHIBIT**

_A_

"Sale Notice Date"), the Company shall be deemed to have been hereby granted by the Offering Stockholder the right and option to purchase from the Offering Member, all (and not less than all) of the Offering Stockholders stock on the Sale Terms. Such right and option may be exercised by written notice from the Corporation to the Offering Shareholder within thirty (30) days after the Sale Notice Date. If the Corporation does not exercise its option to purchase within the thirty (30) days, the stock may be sold to the intended transferee pursuant to the Sale Terms. In the event any stock is transferred to any party (other than the Corporation) pursuant to any provision hereof, the transferee shall take such Shares pursuant to all provisions, conditions, and covenants of this Agreement, and, as a condition precedent to the transfer of such Shares, the transferee shall agree (for and on behalf of himself or itself, his or its legal representatives and his or its transferees and assigns) in writing to be bound by all provisions of this Agreement as a party hereto and in the capacity of a Shareholder.

3.    **Voluntary Sale During Life.** A Stockholder shall have the option to sell, transfer or otherwise dispose of his/her stock to the Corporation on an annual basis on such date determined by the Corporation. If Stockholder desires to exercise such option, Stockholder shall deliver a written notice to the Corporation, on such date determined by the Corporation, which shall set forth the number of shares of Stockholder's stock that Stockholder is offering for sale to the Corporation. In no event shall the Corporation be obligated to repurchase such stock; however, the Corporation may, in its sole discretion, elect to repurchase the stock, in whole or in part, by delivering written notice to Stockholder of its intention to repurchase and designating how many shares of stock will be repurchased by the Corporation. In such event, Stockholder shall sell to the Corporation, and Corporation shall repurchase, all such stock designated by the Corporation upon the terms and conditions of this Agreement.

4.    **Sale at Death of Stockholder.** Upon the death of Stockholder ("Decedent"), all of the stock of the Corporation owned by Decedent that has not been bequeathed or devised to a Transferee and to which Decedent or his/her personal representative shall be entitled or which are held on account of the Decedent at the time of his/her death, shall be sold by Decedent's personal representative or the trustee, and all, and not less than all, of the stock shall be repurchased by the Corporation upon the terms and conditions of this Agreement.

5.    **Insurance.** If the Corporation shall receive any proceeds of any policy on the life of Decedent, such proceeds shall be paid by the Corporation to Decedent's personal representative to the extent necessary to discharge any indebtedness of Decedent to the Corporation, and the balance shall then be applied against the purchase price of Decedent's stock, such payment to be deemed made on account of such purchase price. If any beneficiary of the Decedent shall receive any insurance proceeds from any insurance policy, the premiums of which have been paid by the Corporation, such proceeds shall be applied against the purchase price of Decedent's stock, and the Corporation shall receive a credit against the purchase price in such amount at the closing.

6.    **Sale at Death of Transferee.** Upon the death of a Transferee, all of the stock of the Corporation owned by such Transferee and to which Transferee or his/her personal representative shall be entitled or which are held on account of the Transferee at the time of his/her death, shall be sold by Transferee's personal representative or the trustee, and all, and not

less than all, of such stock shall be repurchased by the Corporation upon the terms and conditions of this Agreement.

7.      **Repurchase at Option of the Corporation.** The Corporation shall have the right to repurchase the stock, in whole or in part, owned by Stockholder at any time.   If the Corporation desires to exercise this option, the Corporation shall deliver written notice to Stockholder of its intention to repurchase the stock of Stockholder and designate how many shares of stock Corporation will repurchase. In such event, Stockholder shall sell to the Corporation, and the Corporation shall repurchase, the stock designated by the Corporation upon the terms and conditions of this Agreement. However, in the event Corporation elects to purchase less than all of the stock of Stockholder, the Corporation agrees to purchase a sufficient amount of stock so that the repurchase of such stock will not be deemed a dividend distribution under the Internal Revenue Code.

8.      **Tag-Along/Drag-Along Rights.** If agreements are effected, or otherwise agreed to be effected, for the transfer to one or more third parties of at least fifty-one percent (51%) of the outstanding stock of the Corporation in a merger, sale, exchange or similar transaction, then the Stockholder agrees as follows:

a.      The stockholder(s) effecting or agreeing to effectuate such transfer (the "Controlling Stockholder(s)") shall (i) use his or her best efforts to negotiate for the sale of all the corporate stock of the Corporation; (ii) the Stockholder shall have the right to sell Stockholder's stock simultaneously with any sale by the Controlling Stockholder(s) (the "Tag-Along Right"); (iii) the Controlling Stockholder(s) shall have the right to cause the Stockholder to sell Stockholder's stock simultaneously with any sale by the Controlling Stockholder(s) (the "Drag-Along Right"); and (iv) the per stock purchase price for the Controlling Stockholder(s) stock shall be the same as the per stock purchase price for all other Stockholders' stock.

b.      Stockholder shall be deemed to have hereby and thereby agreed to join in such transaction in accordance therewith, and to otherwise cooperate respecting, and in good faith to assist in effecting, such transaction.

9.      **Purchase Price.**   Any stock purchase by the Corporation pursuant to this Agreement shall be purchased at the fair market value of the stock (subject to any applicable discounts or adjustments) as set forth in the most recent valuation prepared by Juris Valuation Advisors, LLC, or such successor appointed by the Corporation in its sole discretion, immediately preceding the date of the written notification of the option exercised by Stockholder or the Corporation, or the date of death of the Decedent or Transferee, as the case may be.

10.     **Closing.** The closing of any purchase of stock under this Agreement shall occur at a time and place designated by the Corporation, which time shall not be more than ninety (90) days following the date of written notification of the option exercised by Stockholder or the Corporation, or the date of death of the Decedent or Transferee, as the case may be.

11.   **Manner of Payment.**   The purchase price for stock purchased under this Agreement shall be paid as follows:

a.   **Cash at Closing.** The Corporation may, at its option, pay the entire purchase price in cash at the closing.

b.   **Payment of Balance of Purchase Price.** If the Corporation does not exercise its right to pay the entire purchase price in cash at the closing, the Corporation may pay the unpaid balance of the purchase price by the delivery of a promissory note of the Company to Stockholder or Decedent's personal representative or trustee, as the case may be.  The term of said note shall be no longer than five years from the date of closing and shall provide for monthly installments which shall become due and owing on the first day of the month immediately following closing and on the first day of each month thereafter until the entire balance shall  be paid.  Each note shall bear interest at the mid-term Applicable Federal Rate (for purposes of Section 1274(d) Internal Revenue Code) per annum from the date of closing and shall provide that the maker shall have the privilege of pre-paying all or any part thereof at any time with interest to the date of pre-payment, and that a default in payment of the note shall cause the remaining unpaid balance on same to become due and payable immediately.

12.   **Delivery of Shares and Further Assurances.**  Upon the closing of any sale transacted pursuant to this Agreement, Stockholder shall deliver to the Corporation the certificates for the stock being repurchased by the Corporation duly endorsed for the transfer. The Corporation and Stockholder shall take all actions necessary to ensure performance under this Agreement.

13.   **Right of Setoff.**  The Corporation shall be authorized to deduct from the purchase price of any stock purchased under this Agreement any amount that is due from Stockholder for the purchase of stock or any other indebtedness of Stockholder.

14.   **Transfer to a Third Party.**  Any stock of Stockholder transferred to a Transferee in accordance with this Agreement shall be bound by the terms and conditions of the Agreement, and such Transferee shall be deemed a party to this Agreement and shall execute a conformed counterpart of this Agreement.

15.   **Endorsement on Stock Certificate.**  The parties agree that the stock certificates relating to the stock shall have endorsed upon their faces the following legend:

"The shares of stock represented by this certificate are subject to the terms of a Redemption Agreement dated _____, between the Corporation and Stockholder, a copy of which is on file in the office of the Corporation."

16.   **Entire Agreement.**  This Agreement embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein and all

prior agreements, understandings and statements, oral or written, between the parties hereto are deemed cancelled and superceded by this Agreement.

17.     **Binding Effect and Severability.**  Except as herein otherwise provided, this Agreement shall enure to the benefit of and shall be binding upon the parties and their personal representatives, successors and assigns. To the extent that any term or provision of this Agreement shall be deemed to be unenforceable, such unenforceability shall not affect the efficacy or enforceability of any other provision hereof.

18.     **Modification.**  Neither this Agreement nor any provision hereof may be waived, changed or terminated orally or in any manner other than by written agreement executed by each of the parties hereto.

19.     **Governing Law.**  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nebraska.

20.     **Counterparts.**  This Agreement may be executed in several counterparts, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have signed this Agreement effective the 10 day of November , 2008.

"CORPORATION"
STRECK, INC.

By: _____
Title:  President

"STOCKHOLDER"
Stacy Ryan

_____
No. of Shares:  550,000

W460251.5                                          5

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT, (herein referred to as the "Agreement"), is made and entered into this _22_ day of _August_, 2012, by and between Streck, Inc., a Nebraska corporation, (herein referred to as the "Company") and Stacy A. Ryan (herein referred to as "Shareholder").

### RECITALS

WHEREAS, Shareholder owns 5,500 shares of the voting common capital stock of the Company represented by Certificate No. 96 and 2,789,470 shares of the non-voting common capital stock of the Company represented by Certificate Nos. 97, 98, 134 and 140 (herein referred to as the "Relevant Shares"); and

WHEREAS, Company has exercised its rights to purchase the Relevant Shares from Shareholder pursuant to paragraph 7 of a Redemption Agreement between Shareholder and Company dated November 10, 2008 (herein referred to as the "Redemption Agreement); and

WHEREAS, the Company represents that the Purchase Price set forth herein for the Relevant Shares is equal to or greater than the "Purchase Price" which would be due under appropriate calculations in accordance with paragraph 9 of the Redemption Agreement (date "effective the 10 day of November 2008"); and

WHEREAS, the Company represents that besides this Agreement, neither the Company nor its shareholders are or have recently been engaged in any negotiations to transfer at least fifty-one percent (51%) of the outstanding stock of the Company in any merger, sale, exchange or similar transaction; and

WHEREAS, this Agreement is not meant to and does not affect any rights, privileges, claims, or demands that Shareholder has pursuant to the Operating Agreement of Ryan Family, L.L.C. and her membership in the Ryan Family L.L.C.

NOW, THEREFORE, in consideration of the premises, the mutual promises and covenants of the parties provided herein, and the other consideration to be paid and transferred under the terms of this Agreement, the parties agree as follows:

1.  **Sale and Purchase of Stock**. Shareholder hereby sells and transfers to Company the Relevant Shares, free and clear of all liens and encumbrances, for the Purchase Price. The Company hereby purchases and acquires from Shareholder the Relevant Shares, free and clear of all liens and encumbrances, for the Purchase Price.

2.  **Purchase Price**. The purchase price for the Relevant Shares is Nine Million Two Hundred Eighty Thousand Two Hundred Thirty-Five Dollars ($9,280,235) (the "Purchase Price") determined according to paragraph 9 of the Redemption Agreement to be paid contemporaneously with the execution of this Agreement. The Purchase Price shall represent the

643372.4



full consideration paid for the Relevant Shares and Shareholder shall not be entitled to receive any other payments or distributions, of any kind, from the Company.

3.    **Shareholder Deliverables**.  Contemporaneously with the execution of this Agreement, the Shareholder shall execute and deliver to the Company in blank a stock power transferring all of the Relevant Shares.

4.    **Representations and Warranties of Shareholder**.  Shareholder represents and warrants that she is the sole, individual beneficial owner of the Relevant Shares; that she possesses good and valid title to the Relevant Shares, free and clear of any liens, claims, pledges and encumbrances of any nature; that she has full and complete unrestricted power and authority to individually transfer, convey and surrender to and deliver to the Company the Relevant Shares without the approval or consent of any third party; that the Relevant Shares represent all of the outstanding equity interests of the Company owned by her; that following the transfer of the Relevant Shares to the Company, she will have no direct or indirect ownership or right in or to any options, warrants, rights, conversion privileges, securities, contracts, commitments, understandings or arrangements by which the Company is bound to issue any additional equity securities or options or warrants to purchase equity interests in the Company or any rights convertible into or exchangeable for equity interests or rights in the Company known by Shareholder to be owned by her.

5.    **Mutual Release**. In consideration of the premises Shareholder and the Company hereby mutually release each other from any and all claims, demands, actions and causes of action which either of them may have against the other, arising out of the ownership or redemption of the Relevant Shares, whether known or unknown, and no matter when arising.

6.    **Incorporation of Recitals**. The Recitals to this Agreement are hereby included in, and by this reference, constitute an integral part of this Agreement and shall be considered a part of this Agreement.

7.    **Entire Agreement**.  This Agreement embodies and constitutes the entire understanding between the parties with the respect to the transactions contemplated herein and all prior agreements, understandings and statements, oral or written, between the parties hereto are merged into this Agreement. The provisions of this Agreement shall survive Closing and shall be construed with any transfer instrument to be executed and delivered hereunder.

8.    **Modification**. Neither this Agreement nor any provision hereof may be waived, changed or terminated orally or in any manner other than by written agreement executed by all of the parties.

9.    **Severability**. To the extent that any term or provision of this Agreement shall be deemed to be unenforceable, such unenforceability shall not affect the efficacy or enforceability of any other provision hereof. Without limiting the generality of the foregoing to the extent that any term or provision of this Agreement shall be deemed by a court of competent jurisdiction to be overbroad, the parties hereto hereby agree that such court shall thereupon reduce or otherwise modify such term or provision to the extent to which it is not then overbroad.

643372.4

10.   **Binding Effect**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, successors, personal representatives, and assigns.  Any previous agreements or understandings between the parties hereto regarding the subject matter hereof are merged into and superseded by this Agreement.

11.   **Governing Law**.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nebraska.

12.   **Counterparts**.  This Agreement may be executed in counterparts, each of which so executed shall be deemed to be an original, and such counterparts shall, together, constitute and be one and the same instrument

IN WITNESS WHEREOF, this Agreement has been executed on date and year first written above.

STRECK, INC.,
a Nebraska corporation

By: _____

Title: _____

_____
Stacy A. Ryan, Shareholder

643372.4